472 So.2d 619 (1985)
ALABAMA POWER COMPANY
v.
Debra W. BEAM, as Administratrix of the Estate of Gary M. Beam, Deceased.
81-1011.
Supreme Court of Alabama.
April 26, 1985.
As Corrected on Denial of Rehearing May 31, 1985.
*620 S. Allen Baker, Jr. and James A. Bradford of Balch, Bingham, Baker, Ward, Smith, Bowman & Thagard, Birmingham and Robert C. Dillon of Merrill, Porch, Doster & Dillon, Anniston, for appellant.
Ernest C. Hornsby and Steven F. Schmitt, Tallassee, and John S. Casey, Heflin, for appellee.
ALMON, Justice.
This appeal involves questions of the liability of Alabama Power Company for the death of plaintiff's decedent, Gary M. Beam. Beam, while working on the construction of Alabama Power's R.L. Harris Dam, died when a concrete pouring form pivoted and caused him to fall some 80 feet. The jury awarded $250,000 to Debra Beam, Gary's widow, as administratrix of his estate.
Alabama Power contracted with the Manhattan-Walton Joint Venture (M-W) for certain aspects of the construction of the Harris dam. Gary was a carpenter employed by M-W to perform work on the dam. His foreman was Charles Surrett, an M-W employee, who took his orders from Omer Bowen, M-W's general carpenter foreman. Gary had been working at the dam for seven months at the time of his accident. He was an apprentice carpenter, while the other members of his crew were journeyman carpenters.
*621 The structure of the dam included vertical piers which were formed by successive pourings of concrete into forms which were put into place by carpenter crews such as that in which Gary worked. The forms consisted of panels which were ten feet long and five and a half feet tall. Two vertical steel beams called strongbacks ran down the outside of each panel, extending downward about four feet. The lower portions of the strongbacks were bolted to the pier at the previous pour level. After the concrete dried at each pour level, the carpenter crews raised the panels to form the mold for the next pour level.
The panels were secured to the piers by two anchor bolts, one in each strongback, fastening into wickets placed in the concrete during each pouring. Five seam bolts held the panels together. A scaffolding platform was attached to the strongbacks, with the walk boards a foot or so below the anchor bolts. The hand rail of the scaffold was three and a half feet above the walk board. The top of the panel was about three feet above this hand rail. For some pourings a two-foot wooden extension was added to the top of the panels. Gary was sitting atop such an extension when the panel pivoted on the one anchor bolt securing it. See the appendix to this opinion depicting the panels as they existed just prior to Gary's fall.
The accident occurred on December 7, 1978. On November 16, pour level fourteen on Pier # 2 had been poured with concrete. Two or three days later, the workmen raised the panels on the east and west sides of the pier to pour level fifteen. The crane which raised the panels would not reach the panel on the south (downstream) end of the pier, however, so that panel was left at pour level fourteen.
The work which Gary and his crew were to do on December 7 consisted of preparing Panel # 2, the middle panel on the east and west sides of Pier # 2, for removal so that a special panel could be inserted in its place. They had done the same task the previous day on Pier # 3, but there was an important difference: the south end panel on Pier # 3 had been raised at the same time as the side panels. This difference was important because the crews customarily left the southernmost anchor bolt out of the side panels on each side until the end panels were raised. This bolt had to go through a wing form on the end panel after passing through the strongback on the side panel. The wing forms created beveled edges on the downstream corners of the piers.
Thus, although Gary and his crew had done similar work on Pier # 3 the previous day, all the anchor bolts had been in place. On Pier # 2, the southernmost panels (Panel # 1) on the east and west side were secured by only one anchor bolt. The panel was kept in place by the seam bolts attaching it to Panel # 2 and by a wooden two-by-four nailed across the wooden extensions on top of the two panels. The work which Gary was instructed to do, however, consisted of removing these bolts and the two-by-four so Panel # 2 could be replaced. After he and another worker removed the seam bolts, they climbed on top of the wooden extensions, Gary on Panel # 1 and his co-worker on Panel # 2, and pried the two-by-four loose. As soon as they accomplished this, Panel # 1 pivoted on its anchor bolt, causing Gary to fall to the pavement below.
Gary's widow Debra, as administratrix of his estate, brought this action against Alabama Power and various other parties, including Gary Haught and Gordon Amsler, two Alabama Power employees working at the Harris dam at the time of the accident. Only these three defendants remained in the action at the close of the trial, and the trial court denied their motions for directed verdict. The jury returned a verdict in favor of Debra, but only against Alabama Power, for the sum of $250,000. The trial court denied Alabama Power's motion for JNOV or, in the alternative, for new trial.
Alabama Power raises four issues: 1) Whether the trial court erred in denying Alabama Power's motion for directed verdict because Alabama Power did not have a duty to provide Gary Beam with a safe *622 place to work, or, if it had such a duty, it did not breach it; 2) Whether the trial court erred in charging the jury that negligence or wantonness on the part of Manhattan-Walton or its employees could be imputed to Alabama Power; 3) Whether the trial court erred in charging the jury on wantonness as against Alabama Power; 4) Whether the trial court erred in admitting testimony as to the purported knowledge of Alabama Power.

Directed Verdict
Alabama Power cites a recent line of cases in support of its argument that it, as premises owner, did not have the responsibility for safety of employees of independent contractors, and did not undertake such a duty either in its contract with M-W or in its actions on the construction site. Beam cites cases reaching different results, distinguishes the cases cites by Alabama Power, and argues that Alabama Power did undertake to provide for safety, both by extensively retaining control of the manner of construction and by explicitly agreeing to supervise safety procedures and conduct safety inspections.
The following cases set forth the applicable law in this area:
In Blount Brothers Construction Co. v. Rose, 274 Ala. 429, 149 So.2d 821 (1962), this Court upheld a judgment on a verdict for the representatives of a deceased employee of a subcontractor against the general contractor. Rose died when he fell while climbing from a crane to a scaffold, and his widow sued the general contractor for negligently or wantonly failing to provide him with a safe place to work. This Court held that the contract between the government and the general contractor, requiring the contractor to provide safety devices, imposed on the contractor a duty to provide subcontractors' employees with a safe place to work; that wantonness "may arise from knowledge that persons, though not seen, are likely to be in positions of danger," and may be shown by inference even though it requires actual knowledge; and that neither wantonness nor assumption of risk was a defense to the charge of wantonness.
In Knight v. Burns, Kirkley & Williams Constr. Co., 331 So.2d 651 (Ala.1976), this Court reversed a dismissal granted to a general contractor. The Court held that, for non-delegable duties, "if the contractor owes a duty to a third person by reason of a contract or by law, he cannot divest himself of liability for the negligent performance of his duty by employing an independent subcontractor." Id., at 655.
Alabama Power Company v. Henderson, 342 So.2d 323 (Ala.1976), is very close on point to the instant case. Henderson was injured when a form for a smokestack ruptured, spilling concrete on him. The jury awarded damages to Henderson, an employee of a general contractor at an Alabama Power site, against Alabama Power. This Court affirmed, holding that the extensive control retained and exercised by Alabama Power over the manner in which the concrete was poured imposed upon it a duty to use due care in supervising the process. The Court held that Alabama Power was chargeable with knowledge of the characteristics of the concrete and the forms, and of the dangers posed by the combination of these characteristics; that Alabama Power had a duty of due care; and that it breached that duty.
The Court in Pate v. United States Steel Corp., 393 So.2d 992 (Ala.1981), relied on the law relative to the duties of a premises owner to affirm a directed verdict for U.S. Steel. Pate and another employee of a contractor at a U.S. Steel plant fell from a scaffolding while removing the forms used to construct a furnace pedestal. They alleged that U.S. Steel breached its duty, as general contractor, to provide them, as employees of a subcontractor, with a safe place to work. The Court cited the law that the premises owner owes no duty to the employees of an independent contractor, and that the test for whether such an owner is also a prime contractor is whether it reserved the right of control over the contractor's work, i.e., whether it retained *623 the right to direct the manner in which the work was performed.
The Court in Pate held that the contract's terms showed only the relationship of owner and independent contractor. The contract also provided that "The safety of all persons employed by Contractor and his subcontractors on Owner's premises, or any other person who enters upon Owner's premises for reasons relating to this contract, shall be the sole responsibility of Contractor." Id., at 994.
Plaintiffs in Pate argued alternatively that the actions of U.S. Steel showed that it had reserved the right of control over the manner of performance, citing Henderson, supra. The Court found, to the contrary, that U.S. Steel "had nothing to do with the construction of the scaffolding from which plaintiffs fell." Id., at 995. The Court also disposed of plaintiffs' argument that U.S. Steel's retention of overall control imposed upon it a duty to provide a safe place to work:
"USS maintained a team of engineers that daily visited the work site with blueprints and specifications in hand to point out deviations from the contract and have them corrected. Several contractors, including [plaintiffs' employer], had been hired by USS to build the furnace; and, instead of hiring a construction manager, USS did that job itself. Consequently, USS engineers held weekly meetings with the contractors to review progress, plan work and coordinate the construction.
"None of these activities of USS indicates its control over the manner of constructing the furnace, as contemplated in Henderson. USS's actions merely indicate its concern that the results contemplated by the contract were achieved. This is a legitimate concern of the owner. [Citing Looker v. Gulf Coast Fair, 203 Ala. 42, 81 So. 882 (1919).] The complexity and size of the construction work in this case and the elaborate means available to this owner to ensure compliance with the contract do not alter the general rule, viz.:

"`The mere retention by the owner of the right to supervise or inspect work of an independent contractor as it progresses, for the purpose of determining whether it is completed according to plans and specifications, does not operate to create the relation of master and servant between the owner and those engaged in the work. This rule is not altered by the fact that the employer may stop work which is not properly done.'
"41 Am.Jur.2d Independent Contractor § 10 (1968) (footnotes omitted)."
Id. (Emphasis in original.)
Finally, the Court disposed of plaintiffs' argument that U.S. Steel had undertaken to inspect for safety but had inspected negligently. The trial court had found that U.S. Steel made no safety inspections, and plaintiffs did not dispute the finding.
This Court has cited and followed Pate in Thompson v. City of Bayou La Batre, 399 So.2d 292 (Ala.1981); Alabama Power Company v. Smith, 409 So.2d 760 (Ala. 1981); Weeks v. Alabama Electric Cooperative, Inc., 419 So.2d 1381 (Ala.1982); and Columbia Engineering International, Ltd. v. Espey, 429 So.2d 955 (Ala.1983). Thompson and Smith are factually dissimilar, but Weeks and Espey both involve scaffolding accidents on construction sites and so a brief discussion of those cases will help prepare for a full analysis of the instant case.
Weeks was an electrician employed by Foley, a contractor working on AEC's power plant. This Court affirmed summary judgments for AEC and the engineering company which prepared the plans and specifications for the project. AEC contracted with its engineer and a contractor to provide all supervision of the work, and the contractor agreed to be responsible for safety. AEC retained only the right to inspect. The Court also found that AEC had not actually exercised control or undertaken to provide for safety. The engineer was entitled to summary judgment because it had been brought into the action by improper substitution for a fictitious party. *624 Similarly, in Espey, the premises owner had not retained the right of control and had not undertaken to provide for safety.
The following pertinent provisions of the contract between Alabama Power Company ("Purchaser") and the Manhattan-Walton Joint Venture ("Contractor") clearly show that Alabama Power reserved the right to control details of M-W's performance and the manner in which the work was done:
"[T]he Purchaser desires to enter into an agreement with the Contractor, who shall be an Independent Contractor, for the primary purpose of furnishing certain craft labor and supervision ....
"...
"ARTICLE ISCOPE
"The Contractor shall furnish labor and supervision of various crafts as may be required by the Purchaser from time to time to perform certain civil, mechanical, and architectural work ....
"Contractor understands and agrees that Purchaser shall determine the actual quantity of work, labor, supervision, materials, equipment, personnel, subcontracting and other items to be supplied hereunder by Contractor in connection with the construction of R.L. Harris Dam. The Purchaser reserves the right to contract with other contractors to perform any part or parts of the work required for said construction.
"...
"ARTICLE IIPRACTICES AND PERSONNEL
"The Contractor shall ascertain the standard practices and procedures of the Purchaser with respect to the scope of the work, schedules and services to be performed.
"All work and activities of the labor, foremen and supervisors and other personnel of the Contractor shall be coordinated and scheduled by the Purchaser, acting through its Project Superintendent.
"The furnishing of personnel by the Contractor will generally consist of, but not necessarily be limited to the following:
"1. The assigning of one or more qualified persons, as necessary, to full time work at the job site, under the overall direction of Purchaser, who will ... act in all matters pertaining to the procurement of labor, supervision, ... and consult with Purchaser in the planning and scheduling of the manpower requirements for construction ...
"2.... The Contractor shall furnish personnel in numbers and by job classifications as may be requested by the Purchaser in writing from time to time. All of such personnel shall be employees of and paid by the Contractor; however, they shall perform work under the direction and control of the Purchaser, and its engineers, supervisors and others who shall be in charge of the work ...
"...
"ARTICLE IIISUBCONTRACTS
"[Alabama Power retained extensive control over Manhattan-Walton's right to subcontract. This article includes the following provision:] All subcontracts entered into under this provision shall provide that scheduling and coordination, and general supervision of the work will be provided by the Purchaser.
"...
"ARTICLE VIIIRESPONSIBILITY OF PURCHASER
"All work shall be under the direct supervision of the Purchaser .... The Purchaser shall assume full responsibility for the Project work [here a portion was deleted from the jury's consideration]. The Purchaser shall have full responsibility for the proper and workmanlike construction of the project and compliance with all plans and specifications therefor.
"...
*625 "ARTICLE XIIINDEPENDENT CONTRACTOR
"The Contractor, in accordance with its status as an independent contractor, shall not act as an agent or employee of the Purchaser, but shall be and act as an independent contractor, and hereby covenants and agrees that it will conduct itself consistent with such status, that it and its employees will neither hold itself out as nor claim to be an officer or employee of the Purchaser by reason hereof, and that it will not by reason hereof, make any claim, demand or application to or for any right or privilege applicable to an officer or employee of the Purchaser, including, but not limited to, workmen's compensation coverage, unemployment insurance benefits, social security coverage or retirement credit."
A more extensive retention of control could scarcely be imagined. The references to M-W as an independent contractor and the occasional implication that Alabama Power would provide only general or overall supervision do not outweigh the tenor of the contract that Alabama Power can supervise to any degree of detail it wishes. The parties' characterization of their relationship is not controlling. The actual nature of the relationship as set out in the contract will determine the respective duties of the parties. National Security Fire & Cas. Co. v. Bowen, 447 So.2d 133 (Ala.1983); Semo Aviation, Inc. v. Southeastern Airways Corp., 360 So.2d 936 (Ala.1978).
The above-quoted aspects of the contract indicate that Alabama Power retained the right to control the manner of performance. The actual control exercised by Alabama Power supports this conclusion. The evidence showed here that Alabama Power conducted daily safety inspections and weekly safety meetings. Gordon Amsler was the safety director on the project. Alabama Power conducted all the safety inspections on the project.
Alabama Power supervised the work on a day-to-day basis and had the right to tell the laborers what to do. In fact, Larry Lecroy, who worked for Alabama Power at some times and for M-W at others, said the only difference he could tell was who signed his paycheck. Gary Haught provided technical instruction to Bowen, M-W's general carpenter foreman, and solved any problems that the carpenters might encounter in their work.
The extensive control retained and exercised by Alabama Power readily distinguishes this case from the Pate line of cases and puts it within the rule of Henderson. The trial court did not err in denying Alabama Power's motion for a directed verdict. Alabama Power also argues that there was no evidence that Alabama Power breached any such duty, but we shall discuss that under the issue regarding the instruction on wantonness by Alabama Power.

Imputed Negligence or Wantonness
The trial court gave the following instruction to the jury:
"Now, Alabama Power Company contends that the plaintiff should not recover against it because Manhattan-Walton Joint Venture and its employees were not its servant, agent or employees at the time and place complained of, and was an independent contractor. It, therefore, becomes your duty to determine from the evidence whether at the time of Gary Beam's death Manhattan-Walton Joint Venture was an independent contractor....
"...
"If you are reasonably satisfied from the evidence that Manhattan-Walton Joint Venture was not an independent contractor in the performing of the work in question, that Manhattan-Walton was the agent of Alabama Power Company, and was acting within the line and scope of its employment in the performing of the work in question, the Alabama Power Company would be liable to the plaintiff for any injuries suffered by the plaintiff as a proximate cause of any negligence or wantonness on the part of Manhattan-Walton Joint Venture, or its employees."
*626 Alabama Power argues that the reserved-right-of-control test operates only to make a premises owner liable for its own failure to provide a safe place to work, not to give rise to respondeat superior liability for the negligence or wantonness of the contractor. Alabama Power also argues that it did not defend on the basis that Manhattan-Walton was an independent contractor, so this instruction introduced a theory of liability that was not presented by the pleadings or the pre-trial order, nor tried by consent.
During arguments over whether the trial court should give this requested instruction, the court dismissed Alabama Power's argument, noting that "we have tried this case on control and independent contractor sixty percent of the time." We agree that Alabama Power's attempt to distinguish between the premises owner/general contractor question of duty to provide a safe place to work and the general contractor/independent subcontractor question of master-servant liability does not provide a ground for refusing to give the instruction in the circumstances of this case. There was ample evidence regarding the number of Alabama Power employees on the site and the pervasive nature of their responsibilities for the jury to find Alabama Power liable. Because Alabama Power was so extensively directing M-W's employees, providing a safe place to work includes exercising authority to discourage negligence.
The extensive control which Alabama Power retained over M-W rose to such a level that the imputation to Alabama Power of M-W's employees' negligence or wantonness is quite in accord with the principles of respondeat superior liability. The acts of an agent are attributable to the master because the master has instructed the agent what to do and set him to the master's business. With Alabama Power contracting for M-W to work according to Alabama Power's practices and procedures and undertaking to provide safety instruction to M-W employees, we find no merit to Alabama Power's objection to the above-quoted instructions.
Alabama Power also makes the argument that if M-W employees are to be regarded as its servants for respondeat superior purposes, they should also be regarded as its employees for purposes of the workmen's compensation act's ban on suits by covered employees against their employers. Code 1975, §§ 25-5-52 and -53. This argument fails because the definitions of "employer" and "employee" in the workmen's compensation act are statutory and are not met in this case. Under Code 1975, § 25-5-1(4), an "employer" is one "who employs another to perform a service for hire and pays wages directly to such person." M-W paid Beam's wages. Under subsection (6), an employee is one "in the service of another under any contract of hire." Beam's contract of employment was with M-W.
Under similar circumstances, this Court reversed a summary judgment for an owner/general contractor on the basis of the exclusivity provisions of the workmen's compensation act, because the plaintiff was an employee of the subcontractor. Kilgore v. C.G. Canter, Jr. & Associates, 396 So.2d 60 (Ala.1981). In that case, the general contractor provided plaintiff's workmen's compensation coverage, and yet the Court held that, if plaintiff was indeed an employee of the subcontractor, his suit against the general contractor would not be barred. This result is even more appropriate here, because M-W paid Beam's workmen's compensation.

Wantonness Charged Against Alabama Power
Alabama Power contends that it was error for the trial court to instruct the jury on wantonness, because there was no evidence to support such a charge. Alabama Power states that the view of the evidence most favorable to plaintiff would support only a finding that Alabama Power employees at the site knew of the custom and practice of leaving the downstream anchor bolts out of the side panels until the end panel was raised and knew, on the morning *627 of the accident, that the end panel had not been raised when the carpenters were sent up to work on the side panels. This condition, says Alabama Power, was perfectly safe until Beam and his fellow carpenter removed the seam bolts and the two-by-four, and thus Alabama Power had no knowledge of an unsafe condition which would support a finding of wantonness.
This argument contains the seeds of its own refutation. The very task which Beam and the other carpenters were sent to perform was the removal of the make-up bolts and the two-by-four so that Panel # 2 could be replaced. In doing the same task the day before, they had worked on a pier with all the panels at the same level. The carpenters testified that they had never before removed a side panel with an end panel at a lower pour level. Thus, Alabama Power's argument that the pier was safe until the carpenters removed the bolts cannot stand, because the safety condition on this pier was so different from any work the carpenters had previously done. Alabama Power's knowledge of the situation provides evidence from which the jury could conclude that it wantonly instructed M-W to have its carpenters replace Panel # 2 without correcting the unsafe condition that existed, i.e., without first raising the end panel or at least having the carpenters insert the downstream anchor bolt in Panel # 1.
This Court recently quoted the test for wantonness as follows: "Before a party can be said to be guilty of wanton conduct, it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury." Osborne Truck Lines, Inc. v. Langston, 454 So.2d 1317, 1326 (Ala.1984), quoting Lankford v. Mong, 283 Ala. 24, 214 So.2d 301 (1968) (other citations omitted).
Beam, in addressing the breach of duty issue, discusses other aspects of Alabama Power's exercise of its duty to provide a safe place to work. This evidence tends also to support a charge of wantonness on the basis of a knowing failure to comply with the safety procedures which Alabama Power accepted as appropriate to prevent likely injuries. Alabama Power, in undertaking to provide safety inspections, had the responsibility to abide by the regulations of the Occupational Safety and Health Administration providing that a safety program "shall provide for frequent and regular inspection ... by competent persons." Gordon Amsler admitted that Alabama Power normally conducted safety examinations at the beginning of each shift, but none was made at the beginning of the shift when the accident occurred, which was the first time work had been done on Pier # 2 after the attempt to raise the end panel had been unsuccessful two weeks earlier. Beam's expert with extensive experience on hydroelectric dam construction sites testified that areas that have been idle for even a few days should be inspected before work is resumed.
Evidence regarding other aspects of Alabama Power's safety procedures would support a finding of conscious disregard of adequate safety procedures on the construction site. Alabama Power assigned Amsler as the safety engineer for the project, even though he had no experience in safety management, and gave him only a single course of on-the-job training. Alabama Power prepared safety manuals but did not give them to anyone at the Harris dam construction site. There were no written safety checklists; the inspectors worked from memory. Alabama Power provided no lifelines for tying off safety belts nor safety nets below the worksites. Amsler and other Alabama Power employees made the decision not to provide these.
Alabama Power argues that Beam could have tied his safety belt to the panel he was working on, but there was evidence that it is not good safety practice to tie safety belts below the area on which one is working. When Beam climbed to the top of the panel, there was nothing above him, as a lifeline would be, to which he could tie his belt. Furthermore, there was evidence that Alabama Power employees did not *628 regularly use their safety belts and did not enforce the use of safety belts by contractors' employees.
All of this evidence of general disregard of proper safety procedures by Alabama Power employees with that responsibility reinforces the evidence that Alabama Power wantonly disregarded the particular dangerous condition of the panels to which Beam was sent on the morning of his death. There certainly was sufficient evidence of wantonness to justify the court's charging the jury on the law of wantonness.

Attribution of Knowledge to Alabama Power
Alabama Power argues that the trial court erred in allowing a witness to testify that Alabama Power employees knew the customs and practices of the carpenters in leaving the downstream anchor bolts out and in replacing panels. Amsler testified that he was aware of these practices, and thus the evidence is merely cumulative and cannot support an allegation of error.
Finding no merit in any of Alabama Power's allegations of error, we hold that the judgment of the trial court is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, EMBRY and ADAMS, JJ., concur.

ON APPLICATION FOR REHEARING
PER CURIAM.
OPINION MODIFIED; APPLICATION OVERRULED.
TORBERT, C.J., and FAULKNER, ALMON, EMBRY and ADAMS, JJ., concur.
*629