**James L. NORTON, Plaintiff-Appellant, Cross-Appellee,**

v.

**SNAPPER POWER EQUIPMENT, a DIVISION OF FUQUA INDUSTRIES, INC., a Delaware corporation, Defendant-Appellee, Cross-Appellant.**

No. 86–3128.

United States Court of Appeals, Eleventh Circuit.

Jan. 5, 1987.

Rehearing and Rehearing En Banc Denied Feb. 13, 1987.

Charles E. Davis, Wooten, Honeywell, Kest & Martinez, Orlando, Fla., for plaintiff-appellant, cross-appellee.

Thomas M. Burke, Rumberger, Kirk, Caldwell, Cabaniss & Burke, Sharon Lee Stedman, Orlando, Fla., for defendant-appellee, cross-appellant.

Before CLARK, EDMONDSON and KEITH *, Circuit Judges.

CLARK, Circuit Judge:

Plaintiff James L. Norton was injured while using a riding lawn mower manufactured by defendant Snapper Power Equipment. The issue on appeal is whether the district court erred in granting a judgment notwithstanding the verdict to Snapper on Norton's strict liability claim. We reverse.

### FACTS

Norton was, and still is, in the commercial lawn mowing business. He bought a Snapper riding mower in July 1981. On January 24, 1983, Norton was using this mower to clear leaves from a yard which was adjacent to a creek. At the end of his third circular route through the yard, he drove up an incline, traveling in the direction away from the creek. Norton testified that as he reached the top of the incline, approximately six feet from the creek, the mower began to slide backwards toward the creek. Norton says he applied the brakes, but he continued to slide backwards. The lawn mower, with Norton still aboard, crashed into the creek. Norton testified that he kept both hands on the handlebars until the impact of the mower hitting the water knocked him off the seat.

It is undisputed that, at some point during this crash, Norton's hand was caught in the lawn mower's blades, thereby amputating four of his fingers. It is not known, however, precisely how the injury occurred. According to Norton, he scrambled to the other bank of the creek after the crash, and only then noticed his injury.

Norton filed suit in Florida state court alleging that the lawn mower was unreasonably dangerous, and therefore defective, because it did not have a "dead man" control or automatic blade stop device. Snapper removed the action to the Middle District of Florida on September 24, 1984. The jury trial began on January 13, 1986.

At the close of plaintiff's case, and again at the close of all evidence, Snapper moved for a directed verdict. The court dismissed Norton's negligence and warranty claims, but left the strict liability "defect" claim for the jury. The jury returned a verdict for Norton, holding Snapper liable for 80% of the injuries.[1]

Immediately after dismissing the jury, the district court indicated that it would enter a judgment notwithstanding the verdict:

THE COURT: All right. Gentlemen, I allowed this case to go to the jury reserving a ruling on the motions prior to submission to the jury. The court at this time must give a judgment notwithstanding the verdict of the jury for the defense. The court cannot allow this case to proceed under any of the present law in this case. The court finds that the jury could not have considered in 1981 that the equipment used in the normal course of the equipment as it was designed could have had a defect which was the legal cause of this injury, and that the injury was caused of course by a turnover of the equipment and there is not sufficient evidence presented which a

---

* Honorable Damon J. Keith, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. Under Florida law, comparative negligence is a defense to a strict liability claim. *See West v. Caterpillar Tractor Co.*, 336 So.2d 80 (Fla.1976).

The jury evidently assigned 20% of the fault for the accident to Norton for operating the lawn mower too close to a tree, and for operating the lawn mower on too steep of an incline.

jury could find that there was an inherent defect in the product at that time. So the court must overturn the jury's verdict and render the jury verdict, render a verdict for the defendant in this case.

Record, Vol. 7 at 496. The court entered judgment for Snapper on January 27, 1986. Norton moved for entry of judgment in his favor pursuant to the jury verdict, but this was denied without further opinion. This appeal followed.

On appeal, Norton raises procedural and substantive objections to the judgment notwithstanding the verdict. First, Norton complains that the district court improperly entered the judgment notwithstanding the verdict *sua sponte*, and without having expressly reserved his ruling on the motions for directed verdict. Second, Norton contends there was sufficient evidence presented to the jury to support a finding that the lawn mower was defective and that the defect caused his injury.

## I. *Procedural Objections To The Judgment Notwithstanding The Verdict.*

Norton's first procedural objection is that the district court announced the judgment notwithstanding the verdict *sua sponte*. Norton cites *Johnson v. New York, N.H. & H.R. Co.*, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952), and *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947), for the proposition that a judgment notwithstanding can be entered only upon a specific motion by the losing party.

■ Norton's reliance on these cases is misplaced. In *Johnson* and *Cone*, the Supreme Court held that an *appellate* court was without power to enter a judgment notwithstanding the verdict absent a timely motion by the losing party after trial. Such action by an appellate court deprives the trial court of the choice between entering judgment notwithstanding the verdict and granting a new trial. The trial court, having heard all of the evidence, is in a better position to make such a decision. *Cone,* 330 U.S. at 215–16, 67 S.Ct. at 755.

The issue in *Cone* and *Johnson* was the balance of authority between appellate and trial courts. These cases certainly do not hold that a motion is a pre-requisite to a timely judgment notwithstanding the verdict entered by the *trial* court. *See First Safe Deposit National Bank v. Western Union Telegraph Co.*, 337 F.2d 743, 746 (1st Cir.1964). After the district court announced its ruling, Norton was free to make a motion for new trial. Thus, Norton was not prejudiced by the district court's *sua sponte* ruling. *See Shaw v. Edward Hines Lumber Co.*, 249 F.2d 434, 439 (7th Cir.1957) (district court could enter judgment notwithstanding the verdict *sua sponte* where plaintiff's ability to move for a new trial was not adversely affected).

Moreover, reversing the trial court on these grounds would be senseless. As noted in *First Safe Deposit, supra,* the district court "could have asked the defendant to file an immediate Rule 50(b) motion, and have acted upon it. To say that it could not, instead, act on the reserved pre-verdict motion, would be to insist upon form over substance." 337 F.2d at 746 (footnote omitted).

■ Norton's second procedural objection is that the district court did not expressly state that it was reserving its ruling on Snapper's motion for a directed verdict. As noted previously, the court directed a verdict on Norton's negligence and warranty claims, but allowed the strict liability claim to go to the jury. Norton's argument is without merit. Fed.R.Civ.P. 50(b) states that "[w]henever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." Given the clear language of this rule, it is unnecessary for the district court to expressly reserve its ruling on a motion for directed verdict. Snapper's counsel raised the causation and defect issues in his oral motion for directed verdict at the close of evidence. When the court allowed these questions to go to the

jury, Norton was on notice that these issues could be the subject of a judgment notwithstanding the verdict.

## II. *Substantive Objections To Judgment Notwithstanding The Verdict.*

The test for granting a judgment notwithstanding the verdict is the same as the test for granting a directed verdict. The court considers the evidence in the light most favorable to the non-moving party and should grant the judgment notwithstanding the verdict only where the evidence so strongly and favorably points in favor of the moving party that reasonable people could not arrive at a contrary verdict. The district court cannot reweigh the evidence. *Jackson v. Magnolia Brokerage Co.,* 742 F.2d 1305, 1307 (11th Cir.1984).

The issues in this case were: (1) whether the failure to install "dead man" devices rendered the 1981 Snapper mower "defective;" and (2) if the lawn mower was defective, whether the lack of a "dead man" control caused Norton's injury. Snapper claims there was little or no evidence to support the jury's verdict for Norton on either issue.

### A. *Defectiveness of the Lawn Mower.*

■ The Florida Supreme Court has adopted the doctrine of strict liability as stated by the American Law Institute Restatement (Second) of Torts § 402A. *See West v. Caterpillar Tractor Co.,* 336 So.2d 80, 87 (Fla.1976). Section 402A provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or the consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

*Id.* at 84. The Florida Supreme Court has elaborated somewhat on the language of 402A:

The term "unreasonably dangerous" more accurately depicts liability of a manufacturer or supplier in that it balances the likelihood and gravity of potential injury against the utility of the product, the availability of other, safer products to meet the same need, the obviousness of the danger, public knowledge and expectation of the danger, the adequacy of instructions and warnings on safe use, and the ability to eliminate or minimize the danger without seriously impairing the product or making it unduly expensive. Thus, an unsafe product, whether it be characterized as inherently dangerous or unavoidably dangerous, would not necessarily be an unreasonably dangerous product.

*Radiation Technology, Inc. v. Ware Construction Co.,* 445 So.2d 329, 331 (Fla. 1983). Whether a product is unreasonably dangerous is normally a question for the jury. *See Corbin v. Coleco Industries,* 748 F.2d 411, 419 (7th Cir.1984); *Kosters v. Seven-Up Co.,* 595 F.2d 347, 351 (6th Cir. 1979).

Norton claims the Snapper mower was unreasonably dangerous because it did not have a "dead man" device. Although there are several types of such devices, the basic principle is the same in each type. In order to keep the lawn mower blades spinning, the operator has to remain in a certain position or has to continuously apply pressure to a pedal or handle. When the operator disengages the blades, they are quickly brought to a stop. The 1981 Snapper mowers were designed so that the blades would spin for three to five seconds after the power was turned off. Norton offered evidence that more sophisticated "dead man"

devices are able to stop the blades in less than one second after the operator applies the brakes or releases the handle. It is undisputed that the 1985 Snapper mowers have devices which stop the blades in one to three seconds.

Snapper's contention is that Norton failed to demonstrate at trial that the new, highly effective "dead man" devices were available or feasible for installation in 1981 on Snapper mowers. While this "state of the art" defense was clearly applicable to Norton's negligence claim,[2] there is some dispute whether it is applicable to strict liability claims.[3] *See generally* Robb, *A Practical Approach to Use of State of the Art Evidence in Strict Products Liability Cases,* 77 Nw.U.L.Rev. 1, 9–19 (1982) (discussing divergent views regarding the state of the art defense in strict liability cases). Some courts have held that the feasibility of safety devices speaks to the reasonableness of the manufacturers conduct, and is thus irrelevant to the analysis under § 402(a). *See, e.g., Gelsumino v. E.W. Bliss Co.,* 10 Ill.App.3d 604, 295 N.E.2d 110 (1973); *Carrecter v. Colson Equipment Co.,* 346 Pa.Super. 95, 499 A.2d 326 (Pa.Super.Ct.1985) (state of the art defense improperly injects negligence principles into a products liability case). Other courts have held that the feasibility of alternative designs is relevant to whether the product was "unreasonably" dangerous. *See, e.g., Bruce v. Martin Marietta Corp.,* 544 F.2d 442, 447–48 (10th Cir.1976); *Reed v. Tiffin Motor Homes, Inc.,* 697 F.2d 1192, 1196–97 (4th Cir.1982) (indicating that, although there is a split in authority, the majority rule is that "state of the art" is a relevant consideration in design defect cases). We have not found any Florida law directly on point, but

it is reasonable to conclude that the Florida courts would follow the view that "state of the art" evidence is relevant both to the plaintiff's case and to the defense. In *Radiation Technology,* 445 So.2d at 331, the Florida Supreme Court stated that one of the factors in determining whether a product is unreasonably dangerous is "the ability to eliminate or minimize the danger without seriously impairing the product or making it unduly expensive." Whether the installation of a given safety device was feasible at the time of manufacture would certainly be a relevant factor under *Radiation Technology.* Although we find that there is, under Florida law, a "state of the art" defense in design defect cases, we note that the feasibility of alternative designs is only one factor in the analysis. On the facts of this case, the jury was not required to rule in Snapper's favor based on the "state of the art" evidence offered.

Norton offered two experts who testified that the technology for installing high-quality dead man devices existed well before 1981. One of these experts, John Sevart, testified that he installed a dead man control with a .7 second blade stopping capability on a Snapper lawn mower in 1978. He showed this device to Snapper officials, but they declined to use his device, instead deciding to pursue their own form of dead man device. He concluded that, as of 1981, neither Snapper nor the entire industry was utilizing a "state of the art" dead man device. He also offered his opinion that a lawn mower without such a device was "unreasonably dangerous." Norton also showed that Snapper applied for a patent on a sophisticated dead man device in 1980. In response to Sevart's testimony, Snapper offered expert testimony that the dead man devices available in 1981 were either not

---

**2.** *See Dreiling v. General Electric,* 511 F.2d 768, 775 (5th Cir.1975). Norton does not appeal the district court's directed verdict on the negligence claim.

**3.** It is perhaps a misnomer to refer to "state of the art" as a defense. Plaintiffs might want to offer evidence as to the feasibility of installing a particular safety device to show why a product was defective. This would give the jury a model

by which to judge the dangerousness of the defendant's product. On the other hand, defendants would want to show that their product could not have been made safer given the technology in existence at the time of manufacture. In either case, the use of "state of the art" evidence infuses some measure of "fault" analysis into the strict liability equation.

adaptable to Snapper mowers or were unsafe for other reasons.

■ The jury considered this conflicting evidence and found that the 1981 Snapper mower was defective. As long as there is some substantial evidence (i.e., more than a mere scintilla) to support this verdict, the jury's decision will stand. *See Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969).[4] In a similar case, the testimony of John Sevart regarding the feasibility of installing a dead man control on a 1978 McDonough riding mower was held to be sufficient to reverse a judgment notwithstanding the verdict entered for a defendant manufacturer. *See Eyre v. McDonough Power Equipment Co.*, 755 F.2d 416, 419–20 (5th Cir.1985). We reach the same conclusion here. Based on the expert testimony, the jury could reasonably conclude that the blade stopping time on the 1981 Snapper was something less than "state of the art." Therefore, assuming the applicability of the state of the art defense, the jury could reasonably find that the 1981 Snapper mower was defective.

### B. *Causation.*

Snapper also argues that even if the lawn mower was defective, there was no proof that the lack of a more effective dead man control caused Norton's injury. Since Norton did not know exactly when or how his hand got caught in the blades, and since a reconstruction of the accident was impossible, Snapper contends the jury could not determine whether a blade stopping device would have eliminated or lessened Norton's injury.

Snapper correctly points out that "plaintiffs are not entitled to a verdict based on speculation and conjecture." *Fenner v. General Motors Corp.*, 657 F.2d 647, 651 (5th Cir.Unit B June 1981), *cert. denied*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). The jury is, however, permitted to "reconstruct the series of events by draw-

ing an inference upon an inference." *Id.* at 650.

In *Fenner,* plaintiff contended his automobile veered off the highway because of a defective steering mechanism. The steering problem would only manifest itself if a stone got caught in the steering mechanism. Because plaintiff's vehicle was not examined by any experts and since plaintiff's experts were only able to say that theoretically the accident could have been caused by a stone in the steering mechanism, the district court entered a judgment notwithstanding the verdict for defendant. This court affirmed, noting that the plaintiff's own testimony regarding the moments before the accident was inconsistent with the theoretical scenario described by his experts. In such a case, the jury's inference of causation was unreasonable.

The causation evidence in this case, although circumstantial, was far more impressive than the evidence presented in *Fenner.* Norton testified that the lawn mower slid six feet from the top of a hill into the creek. As he began to slide down the hill, Norton applied the brakes and held on with both hands to the handlebars. Expert testimony revealed that when Norton applied the brakes, an effective dead man device could have stopped the blades in as little as .7 seconds. The blades on the 1981 Snapper would continue to spin for three to five seconds, assuming the power had been turned off. Each of Snapper's experts testified that, given the amount of time the mower would have taken to slide six feet and given Norton's testimony that both of his hands were on the handle bars until the mower hit the creek, a two to three second difference in blade stopping time would have avoided the injury. This is not the type of speculative evidence disapproved in *Fenner.* The circumstances of this case give rise to a reasonable inference that Norton's injuries were sustained several seconds after he applied the brakes and began to slide backwards. Snapper was

---

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. Nov.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

given every opportunity to point out the weaknesses in Norton's proof, but apparently was unpersuasive.

The circumstantial evidence offered by Norton was sufficient to support a reasonable inference of causation. As a result, it was improper to grant the judgment notwithstanding the verdict. The judgment of the district court notwithstanding the verdict is reversed and remanded with instructions to enter judgment in favor of plaintiff.[5]

REVERSED and REMANDED.

---

**5.** Appellee, Snapper Power Equipment, filed a cross-notice of appeal but did not argue any issues in support thereof. As a result, the cross-appeal is DISMISSED.

