Billy Ray CLARK, Plaintiff–Appellee,

**Halliburton Industrial Services Division, Intervenor,**

v.

**CONTAINER CORPORATION OF AMERICA, INC., Defendant–Appellant,**

**Square D. Company, Defendant.**

No. 90–7651.

United States Court of Appeals, Eleventh Circuit.

July 26, 1991.

Carroll H. Sullivan and Jeffrey L. Luther, Clark, Scott & Sullivan, Mobile, Ala., for defendant-appellant.

Richard H. Taylor, Mobile, Ala., for plaintiff-appellee.

Richard W. Vollmer, III, and Robert Jon Hedge, Jackson & Taylor, Mobile, Ala., for intervenor.

Before JOHNSON and COX, Circuit Judges, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

Plaintiff/appellee Billy Ray Clark brought this personal injury action against defendant/appellant Container Corporation of America (hereinafter "CCA") for injuries he suffered during an industrial accident at a CCA facility. Following jury verdict and judgment below in favor of Clark, CCA appealed to this court. We affirm.

### I.

Billy Ray Clark was an employee of Halliburton Industrial Services Division, which was hired by CCA to clean the interior of industrial pipes known as "liquor lines" at CCA's Brewton, Alabama paper mill. Halliburton cleaned the lines by "hydrojetting," a process in which water was pumped at extremely high pressures through a hose and nozzle fitted into the lines. Clark was one of the Halliburton employees responsible for inserting and removing the hose, and he was seriously injured during the course of his work at the CCA facility. Clark had removed the hose from a line so that the line could be inspected, and he was returning to pick up the hose when the water came on unexpectedly. The hose began spraying wildly and Clark was struck repeatedly by the jet of water.[1]

Halliburton supplied the equipment and personnel for the hydrojetting operation. A large diesel pump mounted on a truck generated the water pressure required.

High pressure hoses ran from the pump to the liquor lines. The pump was operated by a foot pedal connected to the pump by long, insulated electrical wires. The foot pedal served as a safety switch. The switch operator could stand where he could see the hose operator and respond to hand signals indicating that power, and water pressure, should be started or stopped. Power was supplied only so long as the switch was depressed by the operator's foot; when the switch was released, the pump stopped. When the pump was activated, water would begin to spray through the nozzle almost immediately, at between 7,000 and 8,000 pounds of pressure per square inch.

Because of the danger of being struck by the jet of water under such high pressure, the employee manning the hose was required to wear a suit of protective clothing. On the day of the accident in which Clark was injured, Clark was fully attired in the required protective clothing.[2] The danger posed by the jet of water was made apparent at trial by the testimony of Frankie Lee Dennis, Clark's co-worker at Halliburton. Dennis testified that he had once seen a man killed when struck by the jet of water from the nozzle. Other witnesses, including CCA employees, confirmed the danger posed by hydrojetting.

Halliburton's work at CCA was carried out under circumstances which differed from those prevailing at its other job sites. When Halliburton performed work for other companies, plant employees were not permitted around the work site. Only Halliburton employees were permitted in the area, and only Halliburton employees assisted in the cleaning process. At no time was Halliburton equipment operated by other than Halliburton personnel.

At CCA, however, CCA employees were routinely assigned by CCA supervisors to assist Halliburton personnel with the hydrojetting operation. At the time of Clark's accident, CCA employee Tommy

---

1. Clark suffered severe cuts and burns requiring multiple surgeries and extensive skin grafts. He is permanently partially disabled.

2. Clark was wearing a helmet, face shield, goggles, slicker suit, steel-toed rubber boots, coveralls and a long-sleeved shirt.

Still was operating the foot pedal which served as a safety switch for activating and deactivating the pump. It is undisputed that at the time of the accident, instead of operating the pedal with his foot and leaving the switch box on the ground as it was designed to be operated, Still held the box in one hand and operated the switch with the other hand. Still testified that he had done so because the ground where he needed to stand was covered by water and other liquids, and he had not felt that it was safe to operate an electrical switch on the ground in those conditions.

Clark testified that, before the accident occurred, he had become displeased with Still's operation of the switch. Still was not paying sufficient attention to his hand signals, Clark felt, and as a result the hose had twice lost pressure unexpectedly, falling out of the line and to the ground some distance below the catwalk where Clark worked among the lines. Approximately twenty minutes before the accident, Clark confronted Still about his alleged lack of attention and Still, Clark testified, had replied to the effect that he worked for CCA and did not have to take orders from Clark. At trial, Still admitted to having released the switch at least once, when he thought he heard someone (other than Clark) shout "shut it off!" He also admitted the confrontation between Clark and him occurred, although he denied having made the remarks attributed to him by Clark. He emphatically denied pressing the switch and activating the pump while the hose was not secured into a line; in other words, he denied causing Clark's injuries.

Other evidence at trial suggested other possible reasons for the pump's unexpected activation. CCA employees testified that they observed CCA trucks running over the wires connecting the pump and switch and that the wires appeared to be in poor condition, although Clark and Frankie Lee Dennis disputed that description. CCA electrician Russell Rice, testifying as an expert, suggested that a short circuit might have occurred, either because of the bad wires

or because of water that he observed in the switch box after the accident.[3] Based on his examination of the switch after the accident, however, Rice concluded that the switch had not malfunctioned, although he suggested that a short circuit because of water in the switch box would have been more likely when the box was held up by hand than if it were left lying flat on the ground. Finally, Rice testified that he did not think the wires between the switch and pump were heavy enough and that he changed both wires and switch after the accident.

CCA moved for a directed verdict at the close of all of the evidence, which the district court denied. The jury returned a general verdict, finding CCA liable for $672,000 in compensatory damages and $150,000 in punitive damages. After trial, CCA moved unsuccessfully for judgment notwithstanding the verdict ("JNOV") or, alternatively, for a new trial. CCA also moved to require structured damages pursuant to Ala.Code § 6-11-3 (Supp.1990). Clark's constitutional challenge to that statute was certified to the Alabama Supreme Court.

## II.

CCA brings three issues before this court. If any of these issues is found to have merit, then this case must be reversed and CCA awarded a new trial, since the jury returned a general verdict and could have determined CCA's liability under any theory, including any discredited by this court. *Walden v. United States Steel Corp.*, 759 F.2d 834, 838 (11th Cir.1985).

The first issue CCA raises is whether the district court erred in denying defendant's motions for directed verdict, JNOV or new trial as to the alleged negligence or wantonness of Still and whether any affirmative jury finding on this issue would be against the great weight of the evidence. The second issue is whether the trial court erroneously allowed the jury to apply the doctrine of inherently and intrinsically dan-

---

**3.** The pump or switch had malfunctioned earlier in the week, although that had caused the pump's engine to continue running after the safety switch was released, not to strike up without the switch having been pressed.

gerous activities and incorrectly charged the jury on the elements of the doctrine as well. The final issue on appeal is whether the district court erred in allowing the jury to consider whether CCA exercised control over the work site to the extent that any negligence committed by Halliburton should be imputed to CCA.

**A.** *Negligence and Wantonness of Still*

■ CCA contends the district court erred in denying its motions for directed verdict, JNOV or new trial on the issue of Still's alleged negligence and wantonness. CCA argues that there was no evidence at trial that Still negligently or wantonly pressed the switch and activated the pump while the hose was out of the line.[4]

In reviewing the denial of a motion for directed verdict or JNOV, this Court must consider all of the evidence in the light and with all reasonable inferences most favorable to the nonmoving party. Only if the evidence so considered points so strongly and overwhelmingly in favor of defendant that reasonable men could not arrive at a contrary verdict can this Court reverse the court below. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969); *Norton v. Snapper Power Equip.*, 806 F.2d 1545, 1548 (11th Cir.1987). To grant a motion for new trial, the district judge must fine the verdict contrary to the great weight of the evidence; the denial of a motion for new trial will be reversed only for abuse of discretion. *Jackson v. Magnolia Brokerage Co.*, 742 F.2d 1305, 1307 (11th Cir. 1984).

Clark presented substantial circumstantial evidence at trial to support an affirmative jury finding on the allegations against Still. Prior to the accident, Clark and Still had a confrontation regarding Still's inattention to Clark's hand signals. Once or twice Still released the safety switch without a signal from Clark. Still held the switch with his hand rather than operating it with his foot and had his other hand under the cover of the switch at the time

the pump engaged and the accident occurred. Clark testified that he looked at Still as the water came on and that Still looked like he was going to sleep. No witness could testify to having been looking at Still when the pump engaged; attention naturally first turned to the hose. No witness could testify to seeing Still's hand on the switch, under its cover, at the precise time the pump engaged. Water sprayed from the hose for only seconds. Uncontradicted testimony revealed that activating the switch elicits almost instantaneous spraying from the hose nozzle.

CCA is correct in arguing that evidence of other possible causes for the pump's unexpected activation was offered at trial and that there was no direct evidence of Still's having pressed the switch. Under the circumstances described above, however, direct evidence would have been unlikely, and more than adequate circumstantial evidence was offered to create a jury question on this issue. Evidence of other possible causes was not so great that this court can hold that no reasonable finder of fact could have concluded that negligent or wanton operation of the safety switch was the cause of the accident in which Clark was injured, or that such a conclusion would have been against the great weight of the evidence.

**B.** *Inherently and Intrinsically Dangerous Activity*

■ CCA contends that the district court erred in submitting to the jury the issue of whether hydrojetting is an inherently and intrinsically dangerous activity. Although one is not ordinarily responsible for the negligent acts of his independent contractor, one who employs an independent contractor to perform work of an inherently and intrinsically dangerous nature is subject to liability for injury caused to others by the contractor's failure to take reasonable precautions. *Jones v. Power Cleaning Contractors*, 551 So.2d 996, 998 (Ala.1989); *Boroughs v. Joiner*, 337 So.2d 340, 342 (Ala.1976). If hydrojetting is an

---

**4.** Wanton conduct is the conscious doing of some act or the omission of some duty with knowledge that injury likely will result. *Kil-*

*crease v. Harris*, 288 Ala. 245, 259 So.2d 797, 801 (1972).

inherently and intrinsically dangerous activity, then CCA can be held liable for negligent acts or omissions committed by Halliburton.

■ No precise definition of "inherently and intrinsically dangerous" exists. *Jones,* 551 So.2d at 999. Generally, work that is of such a nature that " 'injury would probably result … unless it was performed with due care' " is considered to be inherently and intrinsically dangerous. *Id.* (quoting 41 Am.Jur.2d *Independent Contractors* § 41 (1968)). Multiple witnesses at trial, including CCA's own employees, testified as to the dangers inherent in handling a highly pressurized jet of water and the resulting need for special precautions.

■ CCA urges this Court to apply a standard under which only those activities that can never be performed safely can be considered inherently and intrinsically dangerous. This confuses the law regarding ultrahazardous activities with that of the doctrine here at issue. An ultrahazardous activity is one that allows the imposition of strict liability, for it is an activity which cannot be performed safely even in the absence of negligence and with the exercise of all reasonable care. *See Boroughs,* 337 So.2d at 343 (holding that aerial application of insecticides by an independent contractor is an inherently and intrinsically dangerous activity subjecting a landowner to liability for the negligence of the cropduster, but that it is not an ultrahazardous activity subjecting him to strict liability); *Harper v. Regency Dev. Co.,* 399 So.2d 248, 253 (Ala.1981) (characterizing an ultrahazardous or abnormally dangerous activity as one in which the risk of harm cannot be eliminated).

■ CCA further contends that the district court failed properly to instruct the jury as to the elements of the inherently and intrinsically dangerous doctrine. The court did not explain, CCA argues, that liability should not be imposed on CCA if the injury suffered by the plaintiff was due to the collateral negligence of the contractor and not to the danger inherent in the work itself.

A review of the record indicates that CCA failed to object on these grounds to the jury charge. CCA objected to the doctrine's general applicability, not to the exposition of the doctrine contained in the court's charge to the jury. "[O]bjections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error." *Palmer v. Hoffman,* 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645 (1943).

CCA maintains, however, that the failure to charge the jury as to collateral negligence was plain error. *See Wirtz v. International Harvester Co.,* 331 F.2d 462, 465–66 (5th Cir.1964) (holding that even without objection at trial by appellant, error in jury charge so plain that appellate court must consider in order to avoid injustice). We cannot agree. As Clark correctly asserts, there was no evidence at trial of collateral negligence as the term is correctly construed.

■ CCA contends that the evidence showed that Halliburton failed properly to inspect and maintain its equipment and that it was this collateral negligence that caused the accident in which Clark was injured. Collateral negligence, however, is something other than the contractor's failure to take reasonable precautions against the danger that is the very risk which causes an undertaking to be inherently and intrinsically dangerous. In *Boroughs,* 337 So.2d at 342, the court adopted the inherent danger doctrine as defined in 41 Am.Jur.2d *Independent Contractors* § 41 (1968) and Restatement (Second) of Torts, § 427 (1965). These authorities instruct that while an employer is not liable for injuries resulting from its contractor's collateral negligence, the contractor's failure to take reasonable precautions against inherent danger will not shield its employer from liability. *See Boroughs,* 337 So.2d at 342. Alabama courts have not explored further the nature of collateral negligence.

■ Negligence by a contractor performing an inherently dangerous activity will not subject its employer to liability if:

(a) the contractor's negligence consists solely in the improper manner in which he does the work, and

*(b) it creates a risk of such harm which is not inherent in or normal to the work, and*

(c) the employer had no reason to contemplate the contractor's negligence when the contract was made.

Restatement (Second) of Torts § 426 (1965) (emphasis added).

Collateral negligence by a contractor, then, must create a new risk of harm distinct from that risk posed by the very nature of the activity itself. In the case at bar, Clark was injured not as a result of some unforeseen and unexpected risk, but because of that very risk posed by hydro-jetting—the risk of being struck by a jet of water under high pressure.[5] CCA's assertion that Halliburton negligently failed to maintain its equipment properly does not support its argument as to collateral negligence, for plaintiff was not injured as a result of some new risk of harm thereby created. *See Nance v. Leritz,* 785 S.W.2d 790, 793 (Mo.App.1990) (holding that negligence by the contractor causing plaintiff's injury does not preclude the employer's liability if the injury occurred as a direct result of the peculiar risk involved in the contractor's work). We conclude there was no injustice in not instructing the jury as to collateral negligence since there was no evidence of any such negligence. *Wooten v. White Trucks,* 514 F.2d 634, 638 (5th Cir.1975). There was, therefore, no plain error in the jury instructions, if indeed there were error at all.

### C. *Imputed Negligence*

■ CCA's final argument supporting reversal is that the district court erred in submitting to the jury the issue of whether CCA exercised such control over the manner in which Halliburton performed its duties that any negligence by Halliburton which was the proximate cause of Clark's injuries should be imputed to CCA.

■ An independent contractor relationship exists where the contractor is responsible to its employer only as to the result of its work and not as to the manner of performing. *Tittle v. Alabama Power Co.,* 570 So.2d 601, 603–04 (Ala.1990). "If the premises owner exercises control over the means and manner in which work is performed, the owner-independent contractor relationship is converted to that of master and servant...." *Id.* at 604. Halliburton would then be CCA's agent in its performance and CCA would be liable for negligence on the part of Halliburton while Halliburton acted within the line and scope of its employment. *Alabama Power Co. v. Beam,* 472 So.2d 619, 626 (Ala.1985) (holding that retention of control over manner of contractor's performance gives rise to duty to provide a safe workplace which includes duty to exercise authority to discourage negligence and makes proper the imputation of contractor's negligence to premises owner).

■ An employer may retain sufficient control over an independent contractor to ensure that it receives the results it wants without converting the relationship to that of master-servant. *Tittle,* 570 So.2d at 603–04. Inspecting, scheduling and planning are activities within the scope of this level of control. *Pate v. United States Steel Corp.,* 393 So.2d 992, 995 (Ala.1981).

CCA's participation at the job site went significantly beyond these activities. CCA admits that evidence at trial showed "some" level of control by CCA, but asserts that it was not the "extensive" control required by Alabama law, citing *Beam.* In *Beam,* 472 So.2d at 621, plaintiff, an employee of an independent contractor hired by Alabama Power Company to perform work at an Alabama Power construction site, was injured in a fall that occurred when the insecurely bolted wooden platform on which he was standing pivoted. The contract between Alabama Power and the contractor provided that the contrac-

---

**5.** *Cf. Hofstetter v. Union Elec. Co.,* 724 S.W.2d 527, 530–31 (Mo.App.1986) (holding that although erection of crane may have been inherently dangerous, plaintiff's fall from five-foot high crane platform was due to contractor's collateral negligence in failing to provide steps, not from any hazard peculiar to the erection of cranes).

tor's employees would "perform work under the direction and control of" Alabama Power. *Id.* at 624. It further provided that Alabama Power assumed "full responsibility for the proper and workmanlike construction of the project." *Id.* Evidence showed that Alabama Power conducted daily safety inspections and weekly safety meetings, supervised the work on a day-to-day basis, and had the right to tell the laborers what to do. *Id.* at 625. The court held that Alabama Power reserved and exercised the right to control the manner of its contractor's performance, thus assuming the duty to provide a safe place to work and that, therefore, there was no error in charging the jury that any negligence by the contractor could be imputed to Alabama Power. *Id.* at 626.

 It is true that CCA did not so explicitly reserve control for itself over Halliburton's activities at its plant, but defendant misstates the law by suggesting that such a extensive and explicit reservation of control is required. In *Tittle*, 570 So.2d at 608, the Alabama Supreme Court reversed the trial court's summary judgment in favor of defendant, holding that evidence of control by defendant Alabama Power Company was similar to that held sufficient to impose liability on a premises owner in other cases. Plaintiff, an independent contractor's employee, was injured when he slipped on insulation dust on the Alabama Power plant floor. *Id.* at 603. Evidence showed that Alabama Power maintained constant supervision over the activities of its contractor's employees, instructing their crew foreman as to the preferred manner of performance and as to crew assignments. *Id.* at 606–07. Alabama Power asked that certain things be done differently for safety reasons, and had, prior to the accident, assigned one of its employees to sweep insulation dust from the floor where plaintiff later fell. *Id.* at 607–08.

Testimony at trial revealed that CCA's presence and control were pervasive at the site where Halliburton worked. James Burnham, assistant pulp mill superintendent, testified that it was CCA's policy to assist Halliburton employees in cleaning the liquor lines and that the policy was not adopted because Halliburton failed to provide enough of its own employees. He further testified that he assigned CCA employees to operate Halliburton equipment and admitted that, while hydrojetting was dangerous and the less experience operators had the more dangerous a process it was, he nevertheless assigned his own employees to operate Halliburton's equipment despite their relative lack of experience. He further stated that he assigned CCA electrician Russell Rice to inspect and repair the foot pedal switch and the wires leading from it to the pump after the accident, and that he observed those wires lying in liquid, an admittedly unsafe condition. He confirmed that a safety meeting had been held after the accident where it was announced that only Halliburton employees would operate the safety switch in the future. Finally, he admitted that CCA safety rules require work areas to be barricaded, that CCA trucks should not have been permitted to run over the wires connecting the Halliburton equipment, and that he was responsible for safety conditions and for enforcing compliance with CCA safety rules.

Mitchell Coxwell, CCA assistant recovery operator, testified that CCA employees were assigned to work alongside Halliburton employees, and that he worked with the hose operator, inspecting the lines after each use of the hose and telling the operator whether the line was clean enough so that he could move on or whether the line needed further cleaning. He testified that CCA supervisors had a duty to warn about unsafe conditions and CCA employees had a similar duty to report any such conditions that they observed. He confirmed that CCA supervisors assigned CCA employees to operate Halliburton equipment. CCA recovery operator Charles Neese testified that his entire work crew of seven or eight people was assigned to the Halliburton work site, and that it was his job to assign them to work with the Halliburton employees.

Other CCA employees testified that they had operated Halliburton equipment, that they observed CCA trucks running over the

Halliburton wires between the switch and the pump, and that they were supervised at all times by CCA employees. One of the employees reported the CCA trucks to his supervisor. It was undisputed that CCA employee Tommy Still was operating the safety switch at the time of the accident and that it was his decision to operate it by hand rather than by foot as it was designed to be operated. Finally, plaintiff and his co-worker Dennis testified that CCA employees were all over the job site, that they should not have been allowed there, but they could not be kept away and that they, Clark and Dennis, were under direct supervision of CCA personnel much of the time.

On this evidence, it was not error for the trial court to charge the jury on the issue raised by CCA's control over the manner in which Halliburton performed. CCA contends that, even if it had sufficient control over the manner of performance to be charged with a duty to provide a safe work place, that some more extensive level of control was necessary in *Beam* to justify imputing a contractor's negligence to its employer. Though we cannot agree that some higher standard need be met to justify the imputation of negligence,[6] we hold that the pervasive control by CCA evident at the Halliburton job site justified allowing the jury to impute any negligence by Halliburton that it may have found. Although there was no explicit contractual reservation of control and no evidence of formal safety instruction by CCA as there was in *Beam* by Alabama Power, the actu-

al exercise of such control by CCA is apparent.[7]

## CONCLUSION

The verdict and judgment below are AFFIRMED. This case is REMANDED to the district court to await the decision of the Alabama Supreme Court as to the constitutionality of Ala.Code § 6–11–3 (Supp. 1990) regarding structured damages.

---

6. *Beam,* 472 So.2d at 626 (rejecting defendant's attempt to distinguish between duty to provide a safe place to work and master-servant liability and noting that "acts of an agent are attributable to the master because the master has instructed the agent what to do and set him to the master's business").

7. *See Weeks v. Alabama Elec. Co-op., Inc.,* 419 So.2d 1381, 1385 (Ala.1982) (holding, in negligence action against premises owner by employee of independent contractor, that, under Alabama law, agency is determined by the facts and that contractual provisions are not conclusive). Although CCA did not provide formal safety instruction to its contractor's employees

as Alabama Power did in *Beam,* it is more relevant to note that CCA failed to provide safety instruction to its own employees yet assigned them to operate Halliburton equipment in place of Halliburton's employees and, further, most, if not all, of the dangerous conditions that CCA now postulates could have been responsible for the accident in which Clark was injured were within the knowledge of CCA prior to the time of the accident. Speculation about the possible failure of Halliburton properly to maintain its equipment prior to coming to the CCA facility, as to which CCA offered little or no evidence at trial, does not make submitting the imputed negligence issue to the jury reversible error.