This is an appeal of a judgment based on a directed verdict in favor of United States Steel Corporation (hereinafter "U.S. Steel"). Plaintiff James Lee Pickett, an *Page 573 
employee of Ross Neely Express, Inc. (hereinafter "Ross Neely"), sued U.S. Steel for personal injuries sustained when lime blew into his eyes as he attempted to disconnect a Ross Neely trailer from a lime storage facility owned by U.S. Steel. Pickett's wife sued U.S. Steel for loss of consortium, but she does not appeal from the adverse judgment.
U.S. Steel owns a steel manufacturing facility in Fairfield, Alabama, known as the Fairfield Works. To facilitate the operation of Q-BOP furnaces at the Fairfield Works, a pneumatic system for the transfer of powdered lime from trucks into a large storage bin was constructed on the premises of U.S. Steel. This system, referred to as the North Lime Unloading Station, became operational in 1974.
The North Lime Unloading Station has four truck slots into which trailers loaded with lime can be backed for unloading. Each slot is equipped with a flexible rubber blower hose running from an air compressor. The blower hose contains a steel coupling by which the blower hose is connected to the intake end of an air pipe on the trailer. Each slot also has a flexible rubber discharge hose and steel coupling for attaching the discharge hose to the output end of the trailer pipe. After the hoses are connected to the trailer, the compressor is turned on. Air flows through the blower hose, pressurizing the trailer. The pressure in the trailer forces the lime out of the trailer, through the discharge hose, and into U.S. Steel's storage bin. The amount of pressure in the trailer is controlled by a series of adjustable valves on the trailer. A gauge on the trailer indicates the amount of pressure inside the trailer's storage tank.
Ross Neely entered into an oral contract with U.S. Steel in the early 1970's whereby Ross Neely agreed to deliver lime from Allied Chemical Company's lime plant in Calera, Alabama, to the North Lime Unloading Station at the Fairfield Works. The trailers used to transport the lime were owned and operated by Ross Neely. Ross Neely employees unloaded the trailers at the slots in the unloading area at the Fairfield Works.
Pickett was first employed by Ross Neely in 1973. From 1974 until July 1976, he drove lime trucks for Ross Neely and unloaded them at the North Lime Unloading Station. During this time, any blockage in the trailer output line or in the unloading system could be removed by allowing pressure to build in the air pipe and then releasing the air to clear the blockage. Under this procedure, it was not necessary to disconnect the hose couplings in order to clear a blockage in the output line. He left that work in July 1976.
In April 1979, Pickett returned to work at the North Lime Unloading Station as a driver and unloader for Ross Neely. Sometime between July 1976 and April 1979, U.S. Steel had installed a metal screen in the coupling of each discharge hose at the North Lime Unloading Station. Blockages occurred more frequently after the installation of the screens. Rocks and other debris would collect at the screens and block the flow of lime. The use of the screens in the system required the unloader to remove the coupling from the discharge line and to clean the screen by hand whenever a blockage occurred. Also, it was possible for pressure to remain in the discharge line, even when the pressure gauge registered "zero," if one blockage had occurred at the screen and another blockage had occurred in the discharge line.
Pickett was injured on November 18, 1979, when he proceeded to disconnect from the unloading system a trailer containing lime. Pickett had repeatedly attempted to unload the lime, but each time the discharge line would become blocked at the screen. Finally, Pickett decided to move the loaded trailer out of the slot so other trailers could be unloaded. After Pickett had bled off the air from the trailer and had determined that the pressure gauge read "zero," he attempted to disconnect the coupling on the discharge hose. When he did so, lime blew out of the coupling and into his eyes. Pickett sustained serious injuries and he was blinded for a *Page 574 
period of time due to the chemical burns to his eyes.
Pickett claims that U.S. Steel owed a duty to provide him with a safe place to work, arising out of the control he alleges U.S. Steel exercised over the manner in which he performed his job. The issue presented on appeal is whether the trial court erred in directing a verdict for U.S. Steel based on its finding of no evidence that U.S. Steel retained the right to control the manner in which Pickett performed his work for Ross Neely.
Under the facts of this case, the relationship between U.S. Steel and Ross Neely is clearly that of landowner and independent contractor. The duty arising from such a relationship was examined in Weeks v. Alabama ElectricCooperative, Inc., 419 So.2d 1381 (Ala. 1982), where this Court stated:
 "The principles regarding the legal duty of a premises owner to provide a safe place to work for employees of an independent contractor are well settled. See, e.g., Alabama Power Co. v. Smith, 409 So.2d 760 (Ala. 1981); Thompson v. City of Bayou La Batre, 399 So.2d 292 (Ala. 1981); Pate v. United States Steel Corp., 393 So.2d 992 (Ala. 1981); Hughes v. Hughes, 367 So.2d 1384 (Ala. 1979); Evans v. Kendred, 362 So.2d 206 (Ala. 1978); Chrysler Corp. v. Wells, 358 So.2d 426 (Ala. 1978).
 "These cases firmly establish the general rule that a premises owner owes no duty of care to employees of an independent contractor with respect to working conditions arising during the progress of the work on the contract. `The general rule does not apply, however, if the premises owner retains or reserves the right to control the manner in which the independent contractor performs its work.' Thompson v. City of Bayou La Batre, 399 So.2d at 294; Hughes v. Hughes, 367 So.2d at 1386. `When the right of control is reserved, the relationship changes from one of premises owner and independent contractor to that of master and servant.' 399 So.2d at 294."
419 So.2d at 1383. Pickett maintains that the general rule does not apply because U.S. Steel retained the right to direct the manner in which Ross Neely employees performed their work, thus changing the relationship from one of premises owner and independent contractor to that of master and servant.
Because this is a directed verdict case, we must examine the record to determine whether it contains a scintilla of evidence which would support the complaint. Davis v. Balthrop,456 So.2d 42 (Ala. 1984). The often-stated standard of review applicable to a directed verdict was reiterated by this Court inCaterpillar Tractor Co. v. Ford, 406 So.2d 854, 856 (Ala. 1981):
 "A directed verdict is proper only where there is a complete absence of proof on an issue material to the claim or where there are no disputed questions of fact on which reasonable people could differ. Deal v. Johnson, 362 So.2d 214 (Ala. 1978). In considering a motion for directed verdict, the court must apply Rule 50 (e), ARCP, under which `a question must go to the jury, if the evidence, or any reasonable inference arising therefrom, furnishes a mere gleam, glimmer, spark, . . . or a scintilla in support of the theory of the complaint. . . .' Dixie Electric Company v. Maggio, 294 Ala. 411, 318 So.2d 274
(1975).
 "In addition, the trial court must view the entire evidence, and all reasonable inferences which a jury might have drawn therefrom, in the light most favorable to the non-moving party. Alabama Power Company v. Taylor, 293 Ala. 484, 306 So.2d 236
(1975); Vintage Enterprises, Inc., v. Cash, 348 So.2d 476 (Ala. 1977). Also, this Court's function in reviewing a motion for a directed verdict is to review the tendencies of the evidence most favorably to the non-movant, regardless of a view we may have as to the weight of the evidence, and we must allow such reasonable inferences as the jury were free to draw, not inferences which we may think the more probable. Beloit Corp. v. Harrell, 339 So.2d 992
(Ala. 1976)." *Page 575 
We have examined the record, and we conclude that there was not a scintilla of evidence that U.S. Steel exercised any authority or control over the work performed by Ross Neely.
Pickett argues that he presented at least a scintilla of evidence that U.S. Steel exercised control over the manner in which Ross Neely performed its work. Specifically, Pickett contends that U.S. Steel, by its actions, exercised affirmative control over the manner in which Ross Neely employees unloaded lime by installing and maintaining screens in the coupling which connected the U.S. Steel unloading system to the Ross Neely trailer. In his reply brief, Pickett further asserts that U.S. Steel exercised control by:
 "1. Modifying the existing system and maintaining control by `locking-out' the system when it was discovered that screens were not present in the coupling;
 "2. Maintaining the screens in the U.S. Steel coupling when the screens were removed by Ross Neely employees;
 "3. Forcing Pickett to remove the coupling in order to clear blockages at the screen;
 "4. Maintaining an outdoor utilities crew within yards of the unloading station whose job it was to maintain the screens in the coupling."
We cannot conclude that these actions show control by U.S. Steel over the manner in which Pickett's employer, Ross Neely, performed its work.
The issue of a premises owner's control over the manner of performance of work by a contractor has been considered in prior opinions by this Court. In Alabama Power Co. v.Henderson, 342 So.2d 323 (Ala. 1976), Alabama Power Company had contracted with Custodis Construction Company for Custodis to build a concrete smoke stack on the power company's premises. An employee of Custodis was injured when a form broke and caused freshly poured concrete to fall on him. This Court found sufficient control and supervision over the construction work to attach liability to the premises owner. This control was evidenced by the contract with Custodis and by the fact that Alabama Power Company "maintained employees at the concrete mixing plant to continuously check the mixture for suitability for use on this particular job [and] also maintained an employee at the construction site who supervised the pouring of the concrete at all times, and periodically checked the concrete for rate of hardening." Henderson, 342 So.2d at 325.
The rule of Henderson was applied in Alabama Power Co. v.Beam, 472 So.2d 619 (Ala. 1985), where this Court found that Alabama Power Company had retained and exercised extensive control over the manner of performance of construction of a dam by an independent contractor. In Beam, Alabama Power Company had supervised the work on a daily basis and had the right to tell the laborers what to do.
In Pate v. United States Steel Corp., 393 So.2d 992 (Ala. 1981), the issue presented was whether U.S. Steel, the premises owner, had retained the right to direct the manner in which Foster, a contractor, performed its work. Two Foster employees, Pate and Carver, fell from scaffolding while performing work at a U.S. Steel plant. The plaintiffs' principal theory of recovery was that U.S. Steel, as general contractor, breached its duty to provide them, as employees of a subcontractor, with a safe place to work. The court stated that the test for whether U.S. Steel would be recognized as a prime contractor was whether it had reserved the right of control over the contractor's work.
In affirming a judgment based on a directed verdict in favor of U.S. Steel, the Court in Pate held that the terms of the contract showed no relationship other than that of owner and independent contractor. The plaintiffs, citing Henderson, supra, had claimed that the actions of U.S. Steel at the work site indicated its reserved right of control over the manner of performing the work. The Court found, however, that U.S. Steel "had nothing to do with the construction of the scaffolding from which plaintiffs fell." Pate, 393 So.2d at 995. *Page 576 
The plaintiffs had further argued that U.S. Steel had retained control of the construction activity as a whole. They supported this contention by citing the following facts:
 "USS maintained a team of engineers that daily visited the work site with blueprints and specifications in hand to point out deviations from the contract and have them corrected. Several contractors, including Foster, had been hired by USS to build the furnace; and, instead of hiring a construction manager, USS did that job itself. Consequently, USS engineers held weekly meetings with the contractors to review progress, plan work and coordinate the construction."
393 So.2d at 995. The Court held that this evidence was insufficient to show control by U.S. Steel:
 "None of these activities of USS indicates its control over the manner of constructing the furnace, as contemplated in Henderson. USS's actions merely indicate its concern that the results contemplated by the contract were achieved. This is a legitimate concern of the owner. . . . The complexity and size of the construction work in this case and the elaborate means available to this owner to ensure compliance with the contract do not alter the general rule, viz.:
 "`The mere retention by the owner of the right to supervise or inspect work of an independent contractor as it progresses, for the purpose of determining whether it is completed according to plans and specifications, does not operate to create the relation of master and servant between the owner and those engaged in the work. This rule is not altered by the fact that the employer may stop work which is not properly done.'
 "41 Am.Jur.2d Independent Contractor § 10 (1968) (footnotes omitted)."
393 So.2d at 995.
Pickett claims that the actions of U.S. Steel, indicating an exercise of control over the manner in which Ross Neely employees unloaded lime, distinguish this case from Pate and place it within the rule of Henderson. However, there is no evidence that U.S. Steel exercised control to the extent to which the evidence showed active control in Henderson. Although U.S. Steel maintained employees at the North Lime Unloading Station who were responsible for maintaining the screens in the hose couplings, there is no evidence that these employees performed supervision of, or exercised control over, the manner in which Ross Neely employees unloaded lime from the trailers. None of the activities of U.S. Steel show sufficient retention of control to invoke a duty of care by U.S. Steel to the employees of Ross Neely.
Pickett also argues that U.S. Steel retained control over the manner of performing his work for Ross Neely not only due to the fact that U.S. Steel owned and maintained the North Lime Unloading Station, but also because U.S. Steel installed and maintained the screens in the unloading system. After the screens were installed, blockages at the screens could be removed only by uncoupling the discharge hose. Pickett says that he was unable to avoid injury, and says his inability to do so is evidence of the control exercised by U.S. Steel.
The duty owed by a premises owner to an independent contractor with regard to a dangerous instrumentality is premised on the landowner's status. This duty was recited inGlenn v. United States Steel Corp., 423 So.2d 152, 154 (Ala. 1982):
 "`[A]n owner of premises is not responsible to an independent contractor for injury from defects or dangers which the contractor knows of, or ought to know of. If the defect or danger is hidden and known to the owner, and neither known to the contractor, nor such as he ought to know, it is the duty of the owner to warn the contractor and if he does not do this, of course, he is liable for resultant injury. Crawford Johnson Co. v. Duffner, 279 Ala. 678, 189 So.2d 474 (1966).'
 "Veal v. Phillips, 285 Ala. 655, 657-658, 235 So.2d 799 (1970). This rule applies *Page 577 
equally to those employees of the independent contractor on the premises engaged in work in furtherance of performing the contract."
It is clear from Pickett's testimony that he knew the screens had been placed in the couplings and that he knew that pressure in the trailer had to be released before the discharge hose was disconnected from the trailer. Pickett's knowledge of the danger involved in uncoupling trailers from the unloading system releases U.S. Steel from any duty to warn Pickett of such danger on its premises.
In Glenn v. United States Steel Corp., supra, the employee of an independent contractor was electrocuted on the premises of U.S. Steel when a crane came into contact with high-voltage overhead electric lines. The power lines were owned and maintained by U.S. Steel. This Court followed the rule that the landowner owes no duty to the contractor other than to warn the contractor of the dangerous condition. The evidence showed that the supervisory personnel of the contractor were fully aware of the danger and had warned the contractor's employees of the danger on several occasions.
The Glenn case was relied upon in Wallace v. Tri-State MotorTransit Co., 741 F.2d 375 (11th Cir. 1984). Wallace was an employee of Allstate Security Systems, which had contracted with Tri-State to provide security on Tri-State's premises. Wallace was required to open a heavy gate on the property by hand. The gate had been opened mechanically at one time, but the motor had been disconnected. Wallace, who was aware of the dangers in opening the gate by hand, was injured while opening it. The court held that under Alabama law the defendant landowner owed no duty to Wallace.
In both Glenn and Wallace, the employees of the independent contractor had no choice but to perform their duties using the available equipment under the existing conditions. In the instant case, Pickett had no choice but to unload lime using the available equipment under the existing conditions. His knowledge of the danger involved with his work discharged U.S. Steel from further duty under Alabama's "no duty" rule. The fact that U.S. Steel created the condition "does not itself create active negligence outside the `no duty' rule." Wallace, 741 F.2d at 377.
Because Pickett failed to present evidence of a duty owed by U.S. Steel, the trial court was correct in directing a verdict.
AFFIRMED.
TORBERT, C.J., and JONES, SHORES and ADAMS, JJ., concur.