ALMON, Justice.
The defendant Gulf States Steel, Inc., appeals from a judgment on a jury verdict in which the jury awarded the plaintiff Payton Eugene Whisenant $400,000 in damages for pain and suffering, mental anguish, disfigurement, permanent disability and injury, and past lost wages. Whisenant suffered a partial amputation of his right hand while working for Alabama Structural Beams, Inc. (“ASBI”). Gulf States was the only defendant in this action; Whisenant claimed that it was liable for his injury either because it had “retained the right to control the work being done” or because it “voluntarily undertook to control and direct the manner and method in which the plaintiff performed his work.” Gulf States argues that the circuit court erred in denying its motion for a judgment as *901 a matter of law[1] because, it says, there was no evidence in support of either of these theories of liability, and it argues that the • court erred in submitting the question of wantonness to the jury.
At the times pertinent to this action, Gulf States and ASBI were both wholly owned subsidiaries of Brenlin Corporation, an Ohio corporation. Gulf States operates a plant in Gadsden, Alabama, under a lease from Wills Creek Associates, Ltd., another subsidiary of Brenlin. Gulf States subleases a portion of its Gadsden premises to ASBI. The evidence indicates that ASBI buys steel from Gulf States and forms it into I-beams, principally for sale to manufacturers of mobile homes. ASBI’s manager testified that ASBI has about 20 employees.
At the time of his injury, Whisenant was working for ASBI[2] on a machine known as a “slitter.” There was substantial evidence to indicate that the slitter was in an unsafe condition that proximately caused Whisen-ant’s injury. The question, therefore, is whether Gulf States retained a right of control by virtue of which it could be held hable for the unsafe condition of the slitter or voluntarily undertook to act in regard to the slitter so as to assume a duty to make it safe.
In January 1990, Gulf States and Crest Steel Corporation of California entered into an agreement of purchase and sale whereby Gulf States agreed to buy and Crest agreed to sell, for $1,550,000 and other consideration, equipment referred to as a “welded beam line.” The slitter was part of this equipment. It appears that the slitter and the welded beam line itself are the principal equipment used by ASBI to manufacture the steel from Gulf States into I-beams.
On July 1, 1990, Gulf States transferred the welded beam line to Hayes Structurals, Inc., for $10 “and other valuable consideration.” On January 14, 1992, Hayes Struc-turáis became ASBI by an amendment of the articles of incorporation of Hayes Structur-als, Inc.; that amendment simply changed the corporate name to Alabama Structural Beams, Inc. In accordance with the documents and the testimony, this opinion will use the name “Hayes” when referring to events before January 1992, the name “ASBI” when referring to events thereafter, and occasionally “Hayes/ASBI” or just “ASBI” when referring to facts not specific to a time before or after the name change.
Steve Moore, an employee of Gulf States, went to California to look at the equipment before Gulf States purchased it. He testified that, so far as he recalled, Hayes had not yet been incorporated:
“Q. When the machine was actually bought in January — and I will represent to you it was bought in January of ’90, at least this document was signed, did Hayes Structurally] exist at that time?
“A. I am not sure. I don’t recall the date and when Hayes Struetural[s] came into being. I don’t think that it did. I think the equipment was bought, brought here, and put in place before it actually became Hayes Structural[s].”
Moore testified that the equipment was installed by one or more outside contractors. However, Eddy Dean, ASBI’s maintenance superintendent, testified that Moore was involved in “working out the bugs and kinks” of the slitter and that Grier Buff, an employee of Gulf States and later of Hayes, consulted on the slitter line “in the early nineties.”
Moore testified that he gave advice to Hayes/ASBI employees regarding the slitter line:
“Q. Now, after the machine or the slitter line gets set up would there be times prior to my client’s injury that you would go out to the premises and observe the slitter line in operation and provide advice *902 to the employees of ASBI about the machine’s operation and its production?
“A. There were times — times I were— I was there. There was times that the then manager, I would help him with different things but as far as providing advice or about production, this is an entirely different line and it would be hard for me to tell him how much production or what kind of production he should get off this because I never operated a line exactly like this.
“Q. Okay. You have two — at the time that this — well, let’s say in 1993 when my ehent was injured, in 1993 you still had two slitter lines at Gulf States Steel, is that right?
“A. That’s right.
“Q. You had expertise with regard to the operation of the slitter line and its production, did you not?
“A. That’s correct.
“Q. And you would have expected them to have relied on your expertise with regard to their slitter line, would you have not?
“A. If I could help in any way, yes.”
The manager of ASBI, Richard Carlson, was asked about the slitter:
“Q. Did you ever inspect this machine and look over it and see if — attempt to run it to make a determination if there were any hazardous conditions?
“A. No, because I don’t know how to run it.”
From Moore’s testimony and other evidence, the jury could conclude that Gulf States bought the slitter, set it up on its premises before Hayes was incorporated, and was responsible for the condition of the slitter even after Hayes/ASBI began using it.
Other evidence supports the circuit court’s holding that there was evidence that Gulf States retained a right of control over the condition of the slitter. This evidence is somewhat complex, and a description of it requires a brief description of the evidence regarding the corporate structures of Gulf States and ASBI and the relations between the two entities.
The board of directors of ASBI was dominated by employees of Gulf States. The board members included Steve Moore, mentioned above, who was the manager of sheet finishing for Gulf States and who had worked for Gulf States since 1971; George Faragher, who identified himself as the “vice president of union resources” for Gulf States; Craig Nicholson, an employee of Gulf States, identified by one witness as a “financial person” for Gulf States; and Craig Morgan, a salesman for ASBI. When Hayes was formed, Jay Gibney was president of Gulf States, and he was made chairman of the board and president of Hayes; in late 1992 or early 1993, Gibney was replaced as president of Gulf States by John Lefler, who also took over as president of ASBI and chairman of its board. There was testimony that the general manager of Hayes/ASBI was on the board, but the manager himself, Richard Carlson, when asked if he served on the board of directors of ASBI, answered only “I attend the board of directors meetings.”
Thus, it is clear that Gulf States, through its president and its employees on the board of ASBI, had the power to control the activities of ASBI. Moreover, several witnesses testified that the board of directors of ASBI merely advised its president, Gibney and then Lefler, whom the witnesses regarded principally as the chief executive officer of Gulf States. Carlson, the general manager for ASBI, addressed a May 1994 memo regarding “material handling problems on the A.S.B.I. slitter” to John Lefler as “President & CEO Gulf States Steel.” When asked by Whisenant’s attorney why he addressed it to Lefler as president and C.E.O. of Gulf States Steel, Carlson did not have an answer:
“Q. And you were memoing him, why?
“A. To tell him that we had a committee that was working on that.
“Q. Why did you send that to Lefler as president and C.E.O. of Gulf States Steel?
“A. He is the — He is the president of ASBI.
“Q. Is there any reason why you labeled it President and C.E.O. of Gulf States Steel if it was involving an ASBI matter?
“A. No, it was just — ”
*903 Another ASBI employee, Gerald Connell, did not know who was the president of ASBI, but he had met Lefler:
“Q. [By attorney for Gulf States] Do you remember who the president of ASBI was when you went to work there?
“A. The president?
“Q. Uh-huh.
“A. I have no idea.
“Q. Do you know who the president is now?
“A. I have no idea.
“Q. Didn’t meet him at the Christmas party last year? Did you go to the Christmas party last year?
“A. Yeah. Yeah.
“Q. And you—
“A. I got the tail end of it, yeah.
“Q. Okay. And you didn’t meet the president of your company?
“A. I met John Lefler.
“Q. Okay. Do you know if he is the president of your company?
“A. No. He is president of Waterman [sic, Watermill] Ventures. So—
“[Attorney for Gulf States]: Okay. That’s all the questions I’ve got, Judge.

“Redirect Examination

“Q. [By attorney for Whisenant] Do you associate Waterman [sic] Ventures with Gulf States Steel?
“A. That, Ido.”
On further cross-examination, the attorney for Gulf States asked Connell, “Do you know who owned your company before Watermill Ventures?” Connell answered, “I was told that Mr. Brenlin is the one that owned it back when we were called Hayes.” The conveyances of the companies after Whisen-ant’s injury were not otherwise explained; we quote Connell’s testimony simply to point out that, based on his experience as an ASBI employee, he associated Lefler with Gulf States or Watermill, but not with ASBI.
Finally, George Faragher, who testified that his job for Gulf States “Entails employment, safety, medical, labor relations,” testified that he was selected to tell the first manager of ASBI, Jack Causey, that Causey was fired:
“A. Let me explain that to you. Mr. Gibney terminated him, the president of ASBI. He asked me to get with Mr. [Cau-sey], give him the word, do the dirty work, so to speak, give him the word and talk about his severance and I did that, yes.
“Q. And you were instructed by who?
“A. Jay Gibney, the president of ASBI.
“Q. And he was also the president and C.E.O. of somewhere else?
“A. Of Gulf States Steel.”
The fact that the man who was president of both corporations selected a Gulf States officer to give the general manager of ASBI the message that he was fired is further evidence that Gulf States retained a right of control over ASBI.
At the conclusion of the trial, while the parties argued their positions on Gulf States’ motion for a judgment as a matter of law, the following exchange took place between the circuit judge (Judge Boy Moore of the Eto-wah Circuit Court), and the attorney for Gulf States (Mr. James W. McGlaughn):
“The Court: All of these arguments, though, I understand these cases that you are pointing out but we have got the president of ASBI and the president of Gulf States Steel as the same person.
“Mr. McGlaughn: True, that is undisputed, Judge.
“The Court: I know it is undisputed but it is a very unique factor under control. I mean, the board of directors generally controls the way things are done at a business, do they not?
“Mr. McGlaughn: Yes, sir.
“The Court: And when you have got the president of the one company as the same as the president of the other, that is one factor under control, is it not?
“Mr. McGlaughn: It is.
“The Court: And when you have got that one company, Gulf States Steel, who writes all of the checks for the purchases for the machine, now, if you don’t obtain a particular part for a machine are you not, in essence, dictating the way work is done?
*904 “Mr. McGlaughn: No, sir. The evidence in this case is and the only evidence is the board of directors that is called — that is Gulf States Steel employees and ASBI employees have no power over John Lefler to force him to do anything.”
The court’s last question refers to evidence that Gulf States wrote all checks for ASBI and handled all of its financial records. Ray Grigsby, in the purchasing department of Gulf States, issued all of ASBI’s purchase orders and wrote its checks. ASBI’s utility bills were mailed to Gulf States. ASBI’s manager testified that, so far as he knew, ASBI did not pay rent to Gulf States.
The court’s question also refers to a significant item of evidence: On October 28, 1991, IDM Controls, Inc., the contractor that performed maintenance and repairs on the slitter line, recommended safety features for the slitter, including the following:
“Add an additional operators station between slitter and recoiler to prevent dangerous operators practice — IDM will provide the parts for installation of another operators station to include line stop, re-coiler jog, slitter jog, and an E-stop feature.”
The absence of these features was shown to be the proximate cause of Whisenant’s injury: Whisenant was performing work at the recoiler end of the slitter line, and an employee at the slitting end of the line accidentally started the recoiler. The “E-stop” referred to in the IDM letter is an “emergency stop”; the evidence indicates that if the E-stop feature and the additional operator’s station had been installed before Whisenant’s injury, they would have prevented the injury.[3] These safety features included a lockout device to prevent accidental starts, and Steve Moore testified that the slitters he was responsible for at Gulf States had had lockout devices for many years.
However, the recommended features were not added to the ASBI slitter until after Whisenant’s injury. The IDM letter of October 1991 concerned several “system requirements” that IDM would correct “with IDM bearing the financial burden.” IDM’s letter states, ‘We have addressed those issues and also strongly suggest an additional opera-tort’s] station for safety purposes,” but it lists the additional operator’s station and the other safety features as items for which “Hayes would bear the financial burden.” The letter was addressed to Jack Causey, who was the general manager of Hayes Strueturals at the time. An additional copy was sent to “Mr. Steve Moore, Hayes Structural[s].” Steve Moore never worked for Hayes. The fact that the contractor working on the slitter sent a copy of the letter to Moore and the fact that the contractor was under the impression that Moore did work for Hayes tend to support an inference that Moore was more actively involved in the discussions about the maintenance and the safety features of the slitter than he admitted in his testimony.
Finally, there was evidence that James Brown, the Gulf States manager for safety, came through the ASBI portion of the plant periodically to check for safety. Both Gerald Connell, an ASBI employee, and Harold E. Dean, the maintenance superintendent of ASBI, testified that they had seen Brown in the ASBI area and that he had inspected for, or given advice on, safety.
This and other evidence tending to show active involvement by Gulf States in the control of ASBI and, specifically, in setting up and maintaining the slitter and deciding whether to install safety devices on it, is substantial evidence in support of Whisen-ant’s claims that Gulf States reserved a right of control over ASBI and voluntarily undertook to provide for safe operation of the slitter.
Gulf States quotes testimony by ASBI’s employees and by Whisenant that no one from Gulf States supervised their work, instructed them in how to perform their job, or told them how to use or maintain the machinery. It cites cases for the proposition that a premises owner is not liable to an employee of an independent contractor unless it retains the right to control the manner and method in which the work is performed. Parr v. Champion Int’l Corp., 667 So.2d 36 (Ala. *905 1995); Renfro v. Georgia Power Co., 604 So.2d 408 (Ala.1992); Miller v. Degussa Corp., 549 So.2d 454 (Ala.1989); Pugh v. Butler Telephone Co., 512 So.2d 1817 (Ala.1987); Pickett v. United States Steel Corp., 495 So.2d 572 (Ala.1986); Weeks v. Alabama Electric Co-op. Inc., 419 So.2d 1381 (Ala.1982); Thompson v. City of Bayou La Batre, 399 So.2d 292 (Ala.1981); Pate v. United States Steel Corp., 393 So.2d 992 (Ala.1981); Hughes v. Hughes, 367 So.2d 1384 (Ala.1979).
Those cases are of limited application to this fact situation, however, because, under these facts, one must conclude that Gulf States had complete power to control everything ASBI did: its president was, by virtue of being president of Gulf States, also the president of ASBI, and its board was dominated by Gulf States officers and managerial employees. Gulf States was a larger and older corporation, and the evidence supports a conclusion that the parent company of the two corporations incorporated ASBI and set up its corporate structure so that it would be run under the supervision of Gulf States. ASBI bought steel from Gulf States and processed it into a product for sale. Gulf States set the price for the steel and paid itself out of an ASBI account. So pervasive was Gulf States’ control over the financial affairs of the two corporations that the manager of ASBI, Carlson, could only “guess” that ASBI paid Gulf States the market price for steel. Carlson did not even know how ASBI paid Gulf States for the steel:
“Q. Who writes the checks for steel?
“A. We don’t write checks.
[[Image here]]
“Q. Who does?
“A. Gulf States Steel financial department or accounting department writes the cheek.
“Q. So, when you buy steel the Gulf States Steel financial department writes a check to whom?
“A. I would — I can only assume it would be to themselves.”
Before the incorporation of Hayes, the premises later occupied by Hayes and then by ASBI were part of the Gulf States plant. Gulf States purchased and set up the maehin-ery for processing steel into I-beams and, after Hayes was incorporated, transferred that machinery to Hayes for a stated compensation of $10 and unspecified other consideration. There was evidence that Gulf States employees, specifically Steve Moore and James Brown, continued to advise ASBI on the operation and safety of the slitter line. The fact that ASBI employees testified that Gulf States did not supervise their day-today work does not controvert the evidence that Gulf States retained a pervasive, overall right to control ASBI.
Whisenant cites eases such as Mead Coated Board, Inc. v. Dempsey, 644 So.2d 872 (Ala.1994), and Alabama Power Co. v. Beam, 472 So.2d 619 (Ala.1985), as holding that the plaintiffs in those cases presented sufficient evidence that a premises owner reserved such a right of control over its independent contractor as to support a judgment imposing liability on the defendant premises owner. Again, those cases are of only limited relevance, because the only formal relations between Gulf States and ASBI as contracting parties are lessor/lessee and supplier/purchaser of steel.
The case cited by the parties that is perhaps most similar to this one is Hutto v. Vanity Fair Mills, 350 So.2d 417 (Ala.1977). The statement of the facts and the holding of that case include the following:
“Hutto, an employee of Tag Construction Company, Inc., was injured while working on a construction site where his employer was building a mill for Vanity Fair Mills_ He ... [sued several individuals and] Vanity Fair Mills, the owner of the premises upon which the building was being constructed, alleging that, as such owner, Vanity Fair 1... had the right to control the method and manner in which the work ... was performed.’ ...
[[Image here]]
“Tag Construction was engaged to construct the building. This corporation was formed in 1972 and does construction work for Vanity Fair as well as for others. It, like Vanity Fair, is a wholly owned subsidiary ofVF Corporation, a holding company.
*906 “Plaintiff contends that Vanity Fair ‘controlled’ the work being done at the site where he was injured. However, there is nothing in the record to support this contention. The evidence does show that Mr. Blankenship was Vice-President and General Manager of Tag Construction Company, as well as Chief Operating Engineer for Vanity Fair. At the time of the injury complained of, he was being paid by Tag Construction Company and was, in that capacity, in charge of the project. There is also some evidence that when Tag Construction Company was formed in 1972, some of the employees of Vanity Fair became employees of the new corporation. The record is devoid, however, of any evidence that Vanity Fair controlled the affairs of Tag Construction Company, which was admittedly a separate entity. The plaintiff also asserts that when people were hired to work for Tag Construction Company, they were frequently interviewed in the offices of Vanity Fair in Monroeville. The offices of Tag Construction were located nearby; but, according to Mr. Blankenship, this was a mere matter of convenience. It was simply more convenient than doing the paper work at the job site. There is no question but that all employees, including Blankenship, were paid by Tag Construction Company.
“At the time of the trial, Tag Construction Company was still engaged in the construction business and had some fifty employees. The plaintiff has simply failed to show by the evidence that Vanity Fair controlled the operations of Tag Construction Company, and has failed to produce any evidence that Vanity Fair controlled the project upon which he was working at the time of his injuries. The trial court, therefore, properly directed a verdict in its favor.”
350 So.2d at 417-18 (emphasis added).
Whisenant has presented in his ease the evidence of control that Hutto failed to present. The trial court properly held that the evidence was sufficient to submit Whisen-ant’s claims against Gulf States to the jury.
In ruling on a motion for a judgment as a matter of law, a circuit court is to view the evidence in a light most favorable to the nonmoving party and is to draw such inferences favorable to that party as the jury would be entitled to draw. Pickett v. United States Steel Corp., 495 So.2d 572 (Ala.1986); Ford Motor Co. v. Rodgers, 337 So .2d 736 (Ala.1976).
Most of the evidence here consists of documents generated by, and testimony given by, officers or employees of either ASBI or Gulf States. It is clear that Brenlin and Gulf States attempted to set up ASBI as being sufficiently independent of Gulf States to preclude Gulf States from being liable for activities in the ASBI portion of the Gulf States plant. However, there is substantial evidence that Gulf States nevertheless had sufficient control over the ASBI premises, machinery, operations, and employees to require the denial of Gulf States’ motion for a judgment as a matter of law and to support the verdict and judgment for Whisenant.
For the foregoing reasons, the circuit court properly denied Gulf States’ motion for a judgment as a matter of law.
Gulf States also argues that the circuit court erred in submitting the question of wantonness to the jury. It argues both that Whisenant did not claim damages based upon an allegation of wanton conduct and that there was insufficient evidence of wantonness.
Whisenant’s complaint alleged that Gulf States negligently or wantonly breached the duty imposed upon it by its retained right of control or by its voluntary assumption of control. Gulf States construes the pretrial order as dropping Whisenant’s claim for damages based on wanton conduct. In a colloquy that occurred just before the trial began, however, Whisenant’s attorney stated that he was not seeking punitive damages pursuant to the allegation of wantonness, but he asked the circuit court to charge the jury on wantonness for the sake of overcoming Gulf States’ defense of contributory negligence. The circuit court agreed, both at the conclusion of the arguments before the trial began and after renewed arguments on the subject before the court instructed the jury. The court properly instructed the jury on *907 negligence, contributory negligence as a defense to a negligence claim, wantonness, and contributory negligence as not providing a defense to an allegation of wantonness.
The effect of Whisenant’s decision not to seek punitive damages was that he did not have to prove wantonness by clear and convincing evidence. Ala.Code 1975, §§ 6 — 11— 20, 12-21-12; Ex parte Norwood Hodges Motor Co., 680 So.2d 245 (Ala.1996); Hines v. Riverside Chevrolet-Olds, Inc., 655 So.2d 909, 925-26 (Ala.1994). The circuit court did not err in allowing Whisenant to proceed under his allegation of wantonness along with his allegation of negligence as a basis on which the jury could award compensatory damages. If the jury found Gulf States guilty of wantonness, the allegations by Gulf States that Whisenant was contributorily negligent would not provide a defense. Contributory negligence is not a defense to a claim based on wantonness. Sparks v. Alabama Power Co., 679 So.2d 678 (Ala.1996); Knight v. Alabama Power Co., 580 So.2d 576 (Ala.1991). The circuit court properly rejected Gulf States’ argument that the issue of wantonness was not presented by the case as it was postured.
The circuit court also properly rejected Gulf States’ argument that Whisenant had not submitted substantial evidence of wantonness.
“ ‘Before a party can be said to be guilty of wanton conduct, it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury. But knowledge need not be shown by direct proof. It may be made to appear, like any other fact, by showing circumstances from which the fact or actual knowledge is a legitimate inference.’ ”
Osborne Truck Lines, Inc. v. Langston, 454 So.2d 1317, 1326 (Ala.1984), quoting Lankford v. Mong, 283 Ala. 24, 26, 214 So.2d 301 (1968). The fact that Steve Moore, a supervisory employee of Gulf States, had received a copy of the October 1991 IDM letter in which IDM “strongly suggested] ... for safety purposes” that Hayes “[a]dd an additional operators station between slitter and recoiler to prevent dangerous operators practice,” is substantial evidence that Gulf States acted wantonly in failing to correct the defect in the slitter that proximately caused Whi-senant’s injury.
For the foregoing reasons, the judgment is affirmed.
AFFIRMED.
HOOPER, C.J., and SHORES, KENNEDY, COOK, and BUTTS, JJ., concur.
MADDOX and SEE, JJ., dissent.

. See Rule 50, Ala. R. Civ. P. Such a motion was formerly known as a motion for a directed verdict, when it was made before submission of the case to the jury, and as a motion for a judgment notwithstanding the verdict, when it was made after an unfavorable verdict. Gulf States properly made its motion at the close of all the evidence and renewed it after the verdict.

. Whisenant was hired by Personnel Staffing, Inc., to work for ASBI. No issue is presented here on the question of special employer versus general employer, because neither of these entities is a defendant. See generally Terry v. Read Steel Products, 430 So.2d 862 (Ala.1983), and subsequent cases.

. Whisenant’s expert testified that the slitter’s configuration was like having (in the living room) an extra switch for a household garbage disposal.